In the matter of the probate of the last will and testament of
JOHN TUTTY, deceased.

[Decided June 18th, 1917.]

On appeal from a decree of the prerogative court advised by
Vice-Ordinary Stevens, who filed the following opinion:

This is an appeal from the decree of the Morris orphans
court admitting the will of John Tutty to probate. The ap-
peal is based upon the ground that its provisions were the
product of the undue influence exerted by Tutty's son, Wil-
liam, to whom testator gave nearly all his property.

Testator was eighty-four years old at the time of his death
on May 18th, 1914. The will was executed ten days previously.
He left three children—the son, William, and two daughters.
He came to this country from Ireland when a young man and
worked in the mines of Morris county. By his industry he had
accumulated an estate of about seven or eight thousand dollars.
It consisted of a house in Newark worth three or four thousand
dollars, a house at Mount Hope, worth three thousand, two lots
in the same place of small value and a little money. He had
rented the house at Mount Hope to his son, William, who kept
a saloon there. His two daughters lived in New York. He had
been twice married. The three children were those of his first
wife. When his second wife died he went to board with his
daughter Mrs. Monahan, and lived with her from 1910 to
1913. He left, according to the evidence of Mrs. William
Tutty, because his daughter wanted him to pay $20 a month
for his board, and he would not go to William's house because
William wanted $15. His niece Mrs. Flanagan, who lived at
Dover, was willing to take him for $12, and so he went there
in May, 1913. She had four rooms and a husband, who was
a common laborer, and six children. There he remained until
May 3d, 1914, when he was taken to William's house under the
circumstances I will presently refer to. For a considerable

period before his death, he was deaf, had Bright's disease and was afflicted with asthma so badly that he slept at night in a chair. It is proved beyond question that while at the Flanagan house he grew weaker in mind and body and toward the end labored under occasional delusions. He would hit the flour barrel with his cane, saying, "Git up, Dan, git up," and would strike the walls of the room, under the delusion that he was sounding the walls of a mine. He could do little or nothing for himself and required constant attention day and night. Both his doctor and his relatives wanted him to go to some institution where he could be properly cared for. His means were ample; but his penuriousness and prejudices prevented him. Up to the time William took him away from the Flanagans he had made two wills, one, while he was living in New York, giving the Mount Hope property to William, and the Newark property to his two daughters; the other, while with Mrs. Flanagan, giving almost everything to her. This latter will is called in the evidence the Davenport will.

On May 3d, between seven and eight o'clock in the evening, William, who lived only three or four miles away, came to the Flanagan house with his horse and wagon and asked his father to take a drive. He had heard that the Flanagan will had been made. While they were driving, something was said which induced the old man to quit the Flanagans and go to William's house to live. William's account of the conversation, and, of course, he alone knows what occurred, is meager and unsatisfactory. He says:

"I mentioned the Davenport will and he said he didn't know of any Davenport will being drawn.   *   *   *   I told him there was one drawn; he said he *expected* to have another drawn by Mr. Stickle."

On being asked to tell the whole conversation William replied, "That is about as much as I know about it." He says further that when he started he intended to take him back to the Flanagans. His explanation of why he did not is, "He didn't want to come back. He wouldn't stand for it." Now, this is certainly remarkable. The old man was, according to all the evidence, strange as it may seem, perfectly satisfied with

his surroundings. He did, indeed, receive more care from Mrs. Flanagan and from her husband than one would have thought possible under the circumstances. So well satisfied was he that he had made a will in their favor, and in all the testimony not a single complaint is to be found about their treatment of him. William, on the other hand, had heretofore refused to take him unless he was willing to pay $15 a month. But the situation was suddenly changed. William, if we may credit his evidence, without making any bargain with him, merely because the old man "would not stand for it"—*i. e.*, would not stand for going back to the Flanagans, took him, without conditions, to his own home. He says that when he got there he sat up with him all night, but that not a word was said about the will. Early next morning, however, we find him going to Rockaway and bringing back Mr. Stickle. Mr. Stickle says that he found him in the kitchen; that they went into an adjoining room and that the testator told him that he wanted him to draw a will; that he had made a will or two before and they didn't suit him; that he wanted him to make a power of attorney besides. From the instructions then received, he prepared a will, executed on May 8th, four days afterward. Both Mr. Stickle and the subscribing witnesses testify that his mental condition was good when he signed it. He died, as I have said, ten days afterwards.

The question is, Was this will the product of undue influence?

In *Dale* v. *Dale, 38 N. J. Eq. 274,* it was held by the court of errors and appeals that where a mother mentally enfeebled by disease, and in a position where one of her two sons could exercise an improper influence over her, made a will leaving nearly all her property to him, the burden was upon him to show that such instrument was executed without the exercise of undue influence.

In *Lynch* v. *Clements, 24 N. J. Eq. 135,* Vice-Chancellor Dodd quotes the following passage with approval: "In regard to undue influence the cases are almost infinite in number and variety. Where the party to be benefited by the will has a controlling agency in procuring its formal execution, it is uni-

versally regarded as a very suspicious circumstance and one re-
quiring the fullest explanation. So, where a will is unreason-
able in its provisions and inconsistent with the duties of the
testator with reference to his property and family, this will of
itself imposes upon those claiming under the instrument the
necessity of giving some reasonable explanation of the unnatural
character of the will. While undue influence embraces fraud,
fraud by no means embraces every species of undue influence,
since it is quite supposable that one may really exercise a degree
of influence over the testator in producing the testamentary act,
which upon every just ground is fairly entitled to be considered
extreme and unreasonable either in character or degree without
its being fraudulent."

Now, in the case in hand, the disposition was inconsistent with
the duty the testator owed his family. His daughters had as
much claim to share in his bounty as his son. While he had
never quarreled with *them*, he had quarreled with William about
the rent. They were in the habit of going to see him at the
Flanagans. William himself admitted that he knew of no reason
why he should have been preferred.

In considering the question of undue influence the mental
power of the testator must be taken into account. Tutty's mind
had become diseased and enfeebled. As mind and body weaken,
strength to resist the importunity or suggestion of one who occu-
pies the dominate position declines. Four years before his death,
while in good health, Tutty had made a perfectly fair will, ap-
portioning his property among his children. Less than six
months before his death, while living with the Flanagans, he
had made a will in their favor, the provisions of which were alto-
gether indefensible. He could only have done so because men-
tally dominated by his surroundings. Within a few hours after
he had been released from these surroundings, we find him
making another will almost equally inequitable. He makes Wil-
liam the recipient of practically all his property, without getting
from him, if we may believe William's story, a promise even to
care for him until death.

That more passed between father and son than the son is
willing to admit can hardly be doubted. William told Monahan,

testator's son-in-law, the day before the funeral, so Monahan testifies, that he had the will made to suit himself. He told Cahill, the other son-in-law, that, this time, he had the will made out his way. He made a similar statement in the hearing of Margaret Cahill and Mary Spears, and to Mary Monahan he said, he might as well have it as the Flanagans. If these witnesses, all of them of apparent respectability, are interested, they are not more so than William.

His conduct in reference to the other wills merits remark. As soon as the will in his favor was executed, he obtained from his father authority to get the others. Upon getting them he at once burned them. On receiving the will from Mr. Smith, he very disingenuously told him, that if his father wanted another will drawn he would bring him down. "If I do bring him down (so Mr. Smith testifies) I want you to look after my interests, for I think I am entitled to the bulk of the estate." William denies these various conversations, but coming, as they do, from so many witnesses, it is difficult to believe that they did not take place.

We have, then, on the one hand, a man eighty-four years old, whose mind and body have all but failed, and on the other, a son in a position completely to dominate him. No sooner does this feeble old man come under William's influence than he makes a will in his favor, although William admits that he knows of no reason why he should have preferred him. According to the cases before referred to, it is for William to give some reasonable explanation why the inequitable disposition was made, and this he has failed to do. The decree should, therefore, be reversed.

*Mr. Charles A. Rathbun,* for the appellant.

*Mr. Elmer King,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Ordinary Stevens.

*For affirmance*—GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—13.

*For reversal*—None.